O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KHATCHIK H.,

           Plaintiff,

  v.

ANDREW M. SAUL, Commissioner
of Social Security,[1]

           Defendant.

Case No. 2:19-cv-04843- KES

MEMORANDUM OPINION AND
ORDER

## I.

## PROCEDURAL BACKGROUND

Plaintiff Khatchik H. ("Plaintiff") applied for Title II Social Security

disability insurance benefits on July 28, 2015, alleging a disability onset date of

December 31, 2011, with a date last insured ("LDI") of December 31, 2016.[2]

Administrative Record ("AR") 22, 174-75. On September 26, 2017, and March 9,

---

[1] Andrew Saul is now the Commissioner of Social Security and is
automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

[2] Despite an alleged onset date of 2011, Plaintiff's earliest medical records
date from July 2013 (see AR 239). AR 44 (discussing lack of earlier records).

1

2018, an Administrative Law Judge ("ALJ") conducted hearings at which Plaintiff, who was represented by a non-attorney representative, appeared and testified, as did a vocational expert ("VE"). AR 68-74, 37-67, 135. On March 27, 2018, the ALJ from the second hearing issued an unfavorable decision. AR 22-36. The ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "degenerative joint disease of the shoulders and cervical spine; type II diabetes mellitus with peripheral neuropathy; degenerative joint disease of the lumbar spine, and carpal tunnel syndrome" ("CTS"). AR 24. Despite these impairments, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform "light" work with limitations to (1) "occasional" postural activities and working at heights, and (2) "frequent" reaching, handling, and fingering with both upper extremities. AR 25. In the social security context, "occasional" means up to 1/3 of the workday, while "frequent" means up to 2/3 of the workday. See Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5-6 (Jan. 1, 1983).

Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could perform his past relevant work as a warehouse manager as that job is generally performed. AR 32, citing Dictionary of Occupational Titles ("DOT") 184.167-114. The ALJ concluded that Plaintiff was not disabled. Id.

## II.

## ISSUES PRESENTED

Issue One: Whether the ALJ gave clear and convincing reasons for discounting Plaintiff's subjective symptom testimony. (Dkt. 20, Joint Stipulation ["JS"] at 3-4.)

Issue Two: Whether the ALJ erred by (1) giving "little weight" to the medical source statement ("MSS") at AR 431-34; (2) giving "great weight" to the consultative examiner, Dr. Afra, and/or (3) giving "partial weight" to the state medical consultant, Dr. Bessent. (JS at 3, 17.)

1    Issue Three-A: Whether the ALJ's RFC determination is supported by

2    substantial evidence. (Id. at 3.) Plaintiff contends that he should be limited to

3    occasional (not frequent) reaching with no overhead reaching. (Id. at 3, 27.)

4        Issue Three-B: Whether the ALJ erred by characterizing Plaintiff's past

5    relevant work as that of a "warehouse manager." (Id. at 3, 28.)

6                                          **III.**

7                         **SUMMARY OF RELEVANT EVIDENCE**

8    **A. Plaintiff's Testimony.**

9        Plaintiff applied for disability benefits claiming diabetes-related numbness

10   in his fingers, pain affecting his back, right leg, neck, arms, and shoulders, and

11   swelling in his legs, among other conditions. AR 190.

12       Plaintiff testified that he and his brother used to own and operate an auto

13   parts business where he lifted "a lot of heavy stuff," until he had a heart attack and

14   later hurt his back and shoulders. AR 45-46, 48, 52. He described an incident

15   when he tried to lift something heavy that "we sold" from a shelf, causing him to

16   fall and be taken to Olive View UCLA Medical Center ("Olive View"). AR 46-47.

17   Plaintiff testified that he tried to apply for disability benefits after the initial

18   accident, but a "guy" in Van Nuys discouraged him, telling him that it was "too

19   late." AR 50-51. Plaintiff also described a second, similar incident in 2015,

20   stating at one point that it occurred at his "son's house." AR 49. The ALJ noted

21   that he had reported to doctors that the 2015 incident was a work injury, and

22   Plaintiff explained that he told doctors that his 2015 accident was a work injury

23   because his pain started at work in 2011.[3] Id. He testified that after the 2015

24   incident, he could not lift "both hands up, especially the right one," and he started

25   _____

26       [3] In September 2017, Plaintiff told Olive View's Dr. Stephanie Wang that he
     "suffered a work injury 2 yrs ago," after which he had "persistent bilateral shoulder
27   pain with limited" range of motion. AR 636; see also AR 647 (attributing shoulder
     pain to "work injury 2015").
28

to receive periodic shoulder injections for pain relief.  AR 47.

When asked why he stopped working in December 2011, Plaintiff testified that he suffered a heart attack in approximately 2008.  AR 52-53.  When he "got sick" and "couldn't work," his brother "didn't take care of the business," so they "end[ed] up closing the place" after 27 years in business.  AR 52.

Since he stopped working, he has been bored because he "can't do anything," so he often sits and watches TV and talks to family members.  AR 50.  His doctors told him to walk, but when he walks, his ankles swell, so his son got him a "small machine" that he can pedal "like bicycling" while sitting.  AR 55.  He did not testify how often he uses the machine.

He went to a chiropractor who did spinal manipulations that felt "very good," but he discontinued chiropractic treatments; his son was paying for them, and he did not want to burden his son.  AR 55.  He also tried acupuncture, but that did not relieve his pain.  AR 55-56.

Regarding CTS, he testified that his hands started to "get swollen at night," but his doctors gave him a "special brace" to wear and that "kind of helped."  AR 47.

Plaintiff also completed an Exertion Questionnaire in September 2015.  At that time, he claimed pain in his back, shoulders, fingers, and right leg.  AR 197.  His pain medications were naproxen and ibuprofen.  AR 193, 199.  He stated, "I'm home a lot and mostly pass my time watching TV.  I'll read, lay on the couch, go outside for a breath of fresh air, chat with my family, and just pass the day accordingly."  AR 197.  His walking was limited to 8 minutes due to shortness of breath and back pain.  Id.  He could climb stairs and lift small items (like a grocery bag or pot of food) weighing 10-12 pounds.  AR 198.  He went grocery shopping periodically, and he could take out the trash, wash dishes, make the bed, and drive a car.  Id.

In October 2017, he told medical providers that he "spends time at home

4

reading and watching TV. Is a support for his wife with MS.[4] … Would like to be more active. Enjoys going to church once every 2-3 weeks." AR 646. He helped his wife with personal care, including using the bathroom. AR 653.

**B. <u>Summary of Treating Records through December 2016 LDI.</u>**

Plaintiff's medical records provide additional evidence about his activities and physical condition. In July 2013, Plaintiff went to Olive View reporting that he "was cleaning out his garage several days ago and was really sweaty from the work he was doing in combination of the heat and felt an itch" in his left scrotum which he scratched, then noticed swelling and suspected an infection. AR 239. He reported pain in the affected area at a level 2/10 and "denie[d] pain elsewhere." AR 239, 242. A physical examination noted no other abnormalities. AR 240. He was discharged with a "steady gait." AR 244.

In November 2013, he was not on any pain medication and was counselled to exercise for diabetes management. AR 249-50. He told his doctors that he was feeling sad after the "loss of his business." AR 250; AR 260 (noting business closed, causing Plaintiff to lose health insurance).

In March 2014, Plaintiff was treated for the flu. AR 252-53. He was still not taking any pain medication. AR 255, 259. He blamed recent "family troubles" for not "keeping up with his exercise or diet." AR 259. He did not complain of muscle aches. AR 261.

On March 27, 2014, he told Olive View that he had "new right lower back pain" that "started 6 weeks ago while turning to the side." AR 262. He described the pain as "similar" to pain he experienced "6 years ago" (i.e., about 2008) when he was told he had a "spasm of the sciatic nerve." <u>Id.</u> A straight-leg raising test was negative, and Olive View opined that his pain was "likely sciatica." AR 263.

---

[4] Per his IFP application, Plaintiff's wife receives social security disability benefits. (Dkt. 4 at 3.)

Plaintiff was prescribed ibuprofen for 10 days.  Id.

In September 2014, Plaintiff presented at Olive View complaining of neck pain caused by a new pillow.  AR 265-66.  He denied upper or lower extremity weakness and back pain.  AR 266.  He had 5/5 motor strength in his upper extremities with no loss of sensation.  AR 267.  His neck pain was improving since he stopped using the pillow.  AR 268-69.  After taking Motrin, his neck pain was at level 2/10, and he was discharged with a "steady gait."  AR 269-70.  His neck pain resolved within a few days.  AR 275.

At a visit for diabetes management in May 2015, Plaintiff did not complain of any pain, and he was not taking pain medication.  AR 309.  He exhibited "no evidence of neuropathy" and "no LE [lower extremity] edema."  Id.

On July 8, 2015, Plaintiff complained of back and shoulder pain for the last two months "aggravated by lifting heavy object over his head."  AR 292, 311.  He denied neck pain.  Id.  An x-ray of his right shoulder revealed no fracture but "minimal" osteoarthrosis and tendinosis "which may or may not be symptomatic in this patient."  AR 299, 316.  The medical staff assessed bilateral shoulder pain, referred him to rheumatology, and prescribed Naproxen for 2 weeks.  AR 292.  There are no records of a subsequent appointment with a rheumatologist.

In September 2015, Plaintiff complained of "numbness/tingling shooting down his left arm when he is trying to sleep."  AR 345.  At that time, however, he had no lower extremity edema and "full strength and full sensation."  Id.  This record says nothing about Plaintiff being unable to lift either arm overhead.

On November 4, 2015, Plaintiff presented at Olive View complaining of shoulder pain, but he "denied any injury."  AR 343.  A lumbar spinal x-ray revealed "only mild osteoarthorisis."  Id.; AR 326 (x-ray report).  Staff observed that he had full range of motion but "pain on overhead motion" with both shoulders.  AR 344.  Plaintiff was "started on Naproxen which helped" and scheduled for a follow-up visit in January.  AR 343.

Just a few days later, Plaintiff underwent a consultative examination with Dr. Afra on November 12, 2015. AR 319. Dr. Afra did not review Plaintiff's medical records other than the x-ray of Plaintiff's lumbar spine taken at Olive View days earlier. AR 319, 324. Plaintiff complained of pain affecting his neck, shoulders, arms, hands, lower back, and right leg, and swelling in his legs. AR 320. Dr. Afra, however, observed no lower extremity edema. AR 322. Plaintiff had a full range of motion in his neck and shoulders but with tenderness and some pain. Id. He had a slightly reduced range of motion in his dorsolumbar area, but a straight-leg raising test was negative. AR 323. His motor strength was 5/5 with "normal muscle bulk and tone." Id. Plaintiff could walk "without difficulties," including walking on his toes and heels. AR 324. Dr. Afra opined that Plaintiff could do light work with "frequent" fine and gross use of his hands. AR 324-25.

In March 2016, Plaintiff's doctors recommended an injection to address his shoulder pain, but the procedure was postponed while he finished antibiotics to treat an infection. AR 334. His doctors attributed his shoulder pain "likely 2/2 [secondary to] previous rotator cuff injury." AR 336. Plaintiff told his doctors he had attended physical therapy, but they had no "notes in computer." AR 337. At that time, Plaintiff had no lower extremity edema. Id.

Also in March 2016, Plaintiff complained of wrist pain and was diagnosed with CTS that Plaintiff claimed was "debilitating, not allowing patient to work" (although he had "tried ice only"). AR 337. Plaintiff received wrist braces and counselling "about good ergonomics when using computer." AR 335, 337.

In April 2016, Plaintiff received his first right-shoulder injection. AR 331, 527. He had decreased range of motion in his right shoulder pre-injection, but after a partial treatment, he reported "no pain and had improvement in ROM." Id.

In May 2016, Plaintiff reported trouble lifting his right arm overhead to wash his hair. AR 519. He felt that shoulder injections "helped somewhat" and he wanted to continue them. Id. He was counseled to continue physical therapy and

take Tylenol for pain.  AR 520.

On August 23, 2016, Plaintiff reported sharp left wrist pain (AR 514), but by August 30, his wrist pain was "much better … almost resolved."  AR 509.  He had a full range of motion in his elbows and wrists.  Id.  Wrist x-rays showed "mild generalized osteoarthritis."  AR 512.

In October 2016, Olive View described Plaintiff as suffering "chronic r[ight] shoulder pain (negative XR [x-rays]) s/p [status post] rotator cuff injury at work."  AR 501.  On exam, Plaintiff could not "lift his right shoulder above horizontal."  Id.

In November 2016, Plaintiff underwent testing to assess his shoulder pain.  AR 491.  The findings included "moderate osteoarthritis."  Id.  X-rays of his right shoulder were taken and compared to 2015 films, revealing "unchanged" conditions.  AR 496.  X-rays of his left shoulder showed no significant joint narrowing.  AR 498.  A physical exam revealed full range of motion for his left shoulder with "slight limitation" on the right.  AR 499.

In December 2016, Plaintiff's doctors again saw "no swelling, no edema;" he was "using all extremities."  AR 487.

While being evaluated for sleep apnea in November 2017, Plaintiff denied musculoskeletal pain and edema and displayed a "stable gait."  AR 649.

**IV.**

**DISCUSSION**

**A. ISSUE One: Plaintiff's Subjective Symptom Testimony.**

**1. Rules Governing Subjective Symptom Testimony Analysis.**

It is the ALJ's role to evaluate the claimant's testimony regarding subjective pain or symptoms.  See Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Id. at 1112.  An ALJ's assessment of symptom severity is

8

1    entitled to "great weight." <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989).

2    If an individual alleges impairment-related symptoms, the ALJ must

3    evaluate those symptoms using a two-step process. First, "the ALJ must determine

4    whether the claimant has presented objective medical evidence of an underlying

5    impairment 'which could reasonably be expected to produce the pain or other

6    symptoms alleged.'" <u>Treichler v. Comm'r of SSA</u>, 775 F.3d 1090, 1102 (9th Cir.

7    2014) (citation omitted). Second, if the claimant meets the first test, the ALJ may

8    discredit the claimant's subjective symptom testimony only upon making specific

9    findings that support the conclusion. <u>Berry v. Astrue</u>, 622 F.3d 1228, 1234 (9th

10   Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must

11   provide "clear and convincing" reasons for rejecting the claimant's testimony.

12   <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996). If the ALJ's findings are

13   supported by substantial evidence in the record, courts may not engage in second-

14   guessing. <u>Thomas v. Barnhart</u>, 278 F.3d 947, 959 (9th Cir. 2002).

15   **2. Summary of the ALJ's Analysis.**

16   The ALJ found that the evidence of record "suggests the claimant's actual

17   ability to perform basic work functions is far greater than alleged." AR 26. The

18   ALJ gave at least the following reasons for discounting Plaintiff's subjective

19   symptom testimony: (1) lack of supporting objective evidence (AR 26);

20   (2) Plaintiff's inconsistent statements about the timing and origin of his injuries

21   (AR 26-27); (3) the lack of treatment records between December 2011 and July

22   2015 for pain (AR 26-28); (4) conservative pain treatment after July 2015 (AR 28-

23   32); (5) evidence that Plaintiff engaged in activities inconsistent with his claimed

24   limitations (<u>id.</u>); and (6) medical records during his period of claimed disability in

25   which Plaintiff denied pain (AR 28-29).

26   **3. Substantial Evidence Supports the ALJ's Analysis.**

27   a. <u>Reason One</u>: Lack of Supporting Objective Evidence.

28   "Although lack of medical evidence cannot form the sole basis for

9

discounting pain testimony," ALJs may consider that factor in their analysis. Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

All the pre-LDI x-rays of Plaintiff's shoulders, neck, and spine failed to reveal any physical abnormalities consistent with disabling levels of pain.  AR 326, 343, 491-99.

               b.  <u>Reason Two</u>: Plaintiff's Statements About the Timing and Origin of his Injuries.

The ALJ asked Plaintiff if he had a "work injury in 2015."  AR 45.  Plaintiff replied, "Little bit, maybe, yeah, 2014, '15, yes."  <u>Id.</u>  The ALJ then noted that there were "two references" and asked Plaintiff to explain the source of his limitations.  <u>Id.</u>  Plaintiff launched into a description of his "auto parts business," explaining how "auto parts" include "a lot of heavy and bigger stuff," such that he hurt his back and shoulders lifting such items.  AR 45-46.  When pressed for details about exactly what he was doing when he got hurt, Plaintiff explained that he was "lifting" something "we sold … from the shelf," at which point his "hands went backward" and he fell.  AR 46.  The ALJ then asked, "So, you're alleging that you were disabled since 2011?"  <u>Id.</u>  Plaintiff replied, "Yes, I was working and I got hurt, but got more hurt in 2015."  <u>Id.</u>  The ALJ then asked him about the 2015 injury, and Plaintiff stated that he fell again in around July 2015 and a couple days later went to the emergency room at Olive View.  AR 48.  He was not working at the time of this 2015 injury; he instead was at his son's house, climbed on a step ladder, tried to lift a box, and "both of [his]hands went backwards and [he] fell."  AR 49.

The ALJ first noted, accurately, that the record supports the notion that Plaintiff stopped working in 2011 because his business closed, not because of a disabling work injury.[5]  Plaintiff produced no treating records for a fall from a

<hr>

[5] Per earnings reports, Plaintiff worked for Beverly German Auto Parts, Inc. AR 180.  He earned $50,000 or more in 2008 and 2009, but he earned only

ladder in 2011, and he never told any treating source that the history of his back and shoulder pain involved a 2011 work injury.[6]  Instead, he told them that he had suffered a work injury in 2015.  AR 501, 636, 647.  Indeed, in his July 2015 trip to Olive View, he stated that his shoulder pain had started two months earlier.[7]  <u>See</u> AR 292, 311.

Plaintiff also claimed that "everything started[ed] to go downhill" and he "couldn't work" after he "had a heart attack" in 2008.[8]  <u>See</u> AR 27 (citing hearing testimony).  Yet notes from a November 2015 examination state that in 2008, Plaintiff "presented to the hospital because of chest pain" and "was told that he <u>may have</u> had a heart attack <u>in the past</u>," but he was not admitted to the hospital for a heart attack.  AR 320-21 (emphasis added).  The ALJ noted that there were no medical records of evidence for Plaintiff's alleged heart attack.  <u>See</u> AR 27.  Considering all of Plaintiff's statements together with the lack of treating records for any 2011 injury, Plaintiff's failure to pursue benefits in 2011, and Plaintiff's statements to multiple doctors that he suffered a work injury in 2015, the ALJ reasonably concluded that Plaintiff made inconsistent statements about the timing

---

$10,000 in 2010 and $5,000 in 2011.  The corporation declared bankruptcy in February 2013.  CDCA case no. 2:13-bk-14408-RN.  Thus, the business appears to have been suffering as early as 2010, at least a year before Plaintiff claims that he became disabled.

[6] Plaintiff did claim in his August 2015 disability report that he had stopped working on December 31, 2011, because of his "conditions."  AR 190.  This is not outweighed by the other evidence in the record that a physical impairment was not why Plaintiff stopped working.

[7] Notably, Plaintiff's medical records from two months earlier do not mention back or shoulder pain.  Instead, at his May 11, 2015 Olive View appointment, Plaintiff did not tell he doctors that he was experiencing pain, and he was not taking any prescription pain medication.  AR 309-10.

[8] That Plaintiff did not list this heart attack as his date of disability is irrelevant.  He clearly tied his later disability to the alleged 2008 heart attack.

and origin of his back and shoulder pain, casting doubt on the veracity of his claim to have been suffering from disabling pain since December 2011.[9]

### c. Reason Three: Lack of Treatment Records.

The ALJ is permitted to consider lack of treatment in his credibility determination. Burch, 400 F.3d at 681.

While Plaintiff claims a disability onset date of December 31, 2011, the ALJ noted that he produced no treating records between 2011 and July 2013. AR 27. When the record started in July 2013, Plaintiff did not have any back or neck pain. Rather, he was cleaning out his garage and denied pain anywhere except for his groin area where he had a skin infection. Id., citing AR 239, 242. As late as May 2015, he was not complaining of pain and was not taking any pain medication. AR 28, citing AR 309. This supports the ALJ's conclusion that Plaintiff's medical history is inconsistent with his claim to have been suffering from disabling pain since he stopped working in December 2011.

### d. Reason Four: Conservative Treatment.

A conservative course of treatment can provide reason to discount a plaintiff's subjective opinion testimony about the severity of an impairment. Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).

Per the AR, Plaintiff was not receiving any treatment for back and shoulder pain before July 2015. The ALJ summarized Plaintiff's medical records from late

---

[9] Plaintiff cites to the second hearing where his representative stated that, based on Plaintiff's 2015 injury, Plaintiff was "open to an amendment, if that is something you might want to consider." AR 66. Plaintiff states that the ALJ therefore should have at least found him disabled after 2015. (See JS at 6-7.) The issue raised on appeal is whether the ALJ permissibly discounted Plaintiff's subjective symptom testimony. Along with other clear and convincing reasons, the ALJ permissibly considered, as part of the totality of how to weigh Plaintiff's allegations, that Plaintiff's statements about the origins of his injuries were inconsistent.

12

2015 and early 2016 and concluded that after receiving injections and physical therapy, he was "doing well" and "feeling better." AR 29, citing AR 331. His doctors recommended that he continue with that treatment and take Tylenol as needed. AR 30, citing AR 520. Even in 2017, Plaintiff's treating sources advised him to continue with injections and physical therapy, taking ibuprofen as needed. AR 31, citing 647. Plaintiff was never referred for a surgical evaluation. AR 31. He also never received EMG testing to confirm his CTS diagnosis. AR 32. As late as November 2017, Plaintiff denied swelling and musculoskeletal pain. AR 649.

This evidence supports the ALJ's conclusion that the treatment Plaintiff received even after July 2015 was far more conservative than one would expect for a person with the extreme functional impairments claimed by Plaintiff, i.e., he cannot walk more than 8 minutes, he cannot lift more than 12 pounds, and he "can't do anything," so he spends most of his typical day watching television. AR 50, 197-98.

e. <u>Reason Five</u>: Inconsistent Activities.

The ALJ identifies three activities Plaintiff performed during his period of claimed disability as inconsistent with his claimed limitations: (1) cleaning out his garage in 2013 (AR 27, citing AR 239); (2) lifting a heavy box overhead in July 2015 (AR 26-27, citing AR 292); and (3) assisting his wife, including to use the bathroom (AR 31, citing AR 646, 653).

Plaintiff argues that since these were not his "daily" activities, they are irrelevant. (JS at 6.) This argument misses the point. Doing such strenuous activities even once after December 31, 2011, evidences greater exertional abilities than those claimed by Plaintiff. Moreover, Plaintiff's need to provide physical assistance to his disabled wife would appear to be a regular activity, not an isolated one.

Plaintiff also argues that his ability to do periodic vigorous activities is not

13

proof that he could do his past relevant work.  (JS at 6.)  Again, the ALJ cited these activities as inconsistent with Plaintiff's claimed limitations, not as evidence of his RFC.  The ALJ assessed an RFC for "light" work, which is less demanding than lifting heavy boxes, moving items around to clean out a garage, or being a home health aide.  See DOT 354.377-014 (classifying home health aide as medium work).

f.  <u>Reason Six</u>: Plaintiff's Inconsistent Statements About Pain.

The ALJ noted that when Plaintiff applied for disability benefits in July 2015, Plaintiff claimed disabling pain affecting his back, right leg, shoulder, neck, and arms along with leg swelling.  AR 26, citing AR 190.  The ALJ then cites his treating records from July 2013 through July 2015.  Those records do not contain any complaints of chronic pain.  They discuss (1) a March 2014 incident of sciatica with a negative straight-leg raising test (AR 262-63) and (2) neck pain attributed to using a new pillow that quickly resolved (AR 265-70).

The ALJ noted that while in July 2015 and afterwards, Plaintiff told his doctors that he was suffering shoulder pain, physical examinations from this time period revealed unimpaired motor strength and normal muscle tone, full range of motion, although with some tenderness, and reports of improvement from injections.  AR 322-23, 331, 344-45, 487, 519, 527, 649.  The ALJ noted that in May 2017, Plaintiff told his doctors he "felt well," and in November 2017, he denied pain.  AR 30, citing AR 461, 649.

Similarly, while Plaintiff claimed disability on the basis of swelling affecting his legs (AR 26, citing AR 190) and testified that his walking was limited due to ankle swelling (AR 55), no medical source ever observed swelling or edema affecting Plaintiff's lower extremities.  AR 30, citing AR 435-36; see also AR 309, 337, 345, 487.  The ALJ noted that instead Plaintiff was consistently observed to have a steady gait (AR 244, 649) with normal muscle strength and tone (AR 266-67, 323, 345, 441).

Claimants cannot describe their pain to their treating doctors as mild while describing it as far worse to the SSA to try to qualify for disability benefits. The above-cited evidence supports the ALJ's finding that Plaintiff was exaggerating the degree of his shoulder pain and its resulting functional limitations.

**B. ISSUE TWO: Medical Opinion Evidence.**

**1. Summary of the Relevant Law.**

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Turner v. Comm'r of SSA, 613 F.3d 1217, 1222 (9th Cir. 2010) (citation omitted). This rule, however, is not absolute. "Where . . . a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citation omitted); see also Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) ("If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." (citation omitted)).

**2. Medical Source Statement at AR 431-34.**

a. Summary of Opinions.

The September 7, 2017 MSS is signed by an illegible medical source with no identification of his/her employer. AR 434. It follows a title page in the AR stating, "Records From: Dr. Joey Tu, Olive View." AR 430. According to the MSS, Plaintiff is limited to lifting less than 10 pounds, but his ability to stand and walk are unaffected by his impairments. AR 431. The MSS limited Plaintiff's use of his upper extremities, explaining as follows:

Work injury in 2015 lifting heavy object. Suspect rotator cuff injury

bilaterally as patient with very limited range of motion of upper
extremity; unable to lift arms above 90°. Strength flexion/extension
also impaired by pain. Working with physical therapy to improve
mobility.

AR 432. The MSS goes on to find Plaintiff's reaching and handling "limited" but
his fingering "unlimited." AR 433. When asked, however, how often Plaintiff
could perform these activities, the source checked "constantly" for reaching and
handling. Id. The source opined that Plaintiff's ability to maintain concentration
was compromised by pain. Id. Finally, the source wrote, "Unable to fully use his
arms. Cannot operate machinery at this time." AR 434.

            b. The ALJ's Analysis.

The ALJ gave this MSS "little weight." AR 31. The ALJ explained (1) the
author's identity is unknown, precluding consideration of factors such as the length
of the treating relationship (if any) and specialization of the source (if any);
(2) there is no clinical support for "the extensive postural limitations, particularly
when the form states at the same time that the claimant has no sitting, standing, or
walking limitations"; (3) functional limitations described are inconsistent with
Plaintiff's reported activities, including driving and lifting; and (4) the author fails
to consider the improvement Plaintiff achieved with injections. Id.

Reason One: Plaintiff argues that the author must be Dr. Stephanie Wang of
Olive View, because on September 7, 2017 (the same date as the MSS), she saw
Plaintiff and noted "p/w [presents with] for disability form fill-out." AR 441. She
noted "s/p [status post] rotator cuff injury at work" referring to a "work injury
2015." Id. She also noted, "Disability form filled for 6 months but as patient has
not had an MRI showing rotator cuff injury, his disability may get rejected again.
Previous shoulder x-rays unremarkable. MRI b/l shoulders ordered." Id. She
conducted a physical examination and noted that Plaintiff reported pain with
shoulder movement, but she saw no swelling or muscle atrophy, and he was

"nontender on palpation." Id.

The Court agrees that Dr. Wang probably wrote the MSS. The fact that she worked at Olive View, however, does not demonstrate that she had a long-standing treating relationship with Plaintiff. Plaintiff fails to cite any Olive View records signed by Dr. Wang other than the September 7, 2017 records. That record says, "Has PCP [primary care physician] appt 10/27," indicating that Dr. Wang was not Plaintiff's PCP.[10] Olive View's records appear to be signed by many different doctors. Ultimately, while the MSS can be identified as coming from Dr. Wang, the ALJ did not err by failing to consider it as the opinion of a long-time treating physician.

Reasons Two and Three: Per the MSS, Plaintiff can "never" balance, crawl, or stoop, and only occasionally climb stairs, kneel, or crouch. AR 432. Nothing in the statement (or Dr. Wang's one treating record at AR 441) discusses any impairments affecting Plaintiff's legs or knees, the body parts most involved with climbing, kneeling, and crouching. As an explanation of these opinions, Dr. Wang stated, "Climbing, kneeling / crouching limited by fatigue likely secondary to deconditioning." Id. Even Plaintiff concedes that these opinions appear to be an error. (JS at 19.)

The ALJ correctly pointed out that the same medical source statement assessed no limits on standing and walking, activities equally likely to cause fatigue to someone deconditioned by a sedentary lifestyle. AR 31, citing AR 431. The ALJ further stated that "claims of fatigue and deconditioning are refuted by the record, which consistently show the claimant capable of performing daily activities independently …." Id. Indeed, Dr. Wang did not record observations of extreme deconditioning. AR 441 (noting no obvious muscle atrophy). In October

---

[10] On October 27, 2017, Plaintiff met with Dr. Bennett-Schickedanz. AR 646.

2017 (about 1 month after the statement's date), Plaintiff's activities included going to church and helping his disabled wife. AR 646, 653. In September 2015 (just months after his July 2015 injury), Plaintiff reported that he could lift objects weighing up to 12 pounds (AR 198), which is inconsistent with Dr. Wang's opinion that he could only lift less than 10 pounds (AR 431). Plaintiff reported that he could drive (which necessarily involves getting in and out of a car) and complete 20-minute shopping trips. AR 198. The ALJ reasonably found these activities inconsistent with the opinion that Plaintiff could "never" stoop or crawl due to fatigue. Driving is also inconsistent with the opinion that Plaintiff "cannot operate machinery." AR 434.

Reason Four: After meeting with Dr. Wang on September 7, on September 20, 2017, Plaintiff had an MRI of his left and right shoulders to determine if he had suffered a torn rotator cuff. AR 636-39. The MRI of his left shoulder showed tendonitis and degenerative joint changes. AR 637. The MRI of his right shoulder showed similar results. AR 639. After reviewing the MRI, Olive View recommended that he try glucosamine-chondroitin. AR 653. In October 2017, Dr. Bennett-Schickedanz recommended that he continue with injections, physical therapy, and ibuprofen to treat his shoulder pain. AR 647. Less than one month later, Plaintiff denied musculoskeletal pain. AR 649.

This evidence supports the ALJ's conclusion that on September 7, 2017, Dr. Wang lacked sufficient information to provide reliable opinions about the functional limitations attributable to Plaintiff's shoulder pain before Plaintiff's LDI. Dr. Wang suspected a rotator cuff tear (AR 432), but the subsequent MRIs did not confirm that suspicion; they showed degenerative changes and thus shed little light on Plaintiff's condition in 2016 or before. Moreover, whatever the cause of Plaintiff's pain when he saw Dr. Wang, he denied musculoskeletal pain by November 2017. AR 649.

In sum, Plaintiff has failed to demonstrate legal error in the ALJ's decision

18

to give the extreme and contradictory opinions in the MSS little weight.

### 3. Dr. Afra's Opinions.

Plaintiff underwent a consultative examination with Dr. Afra on November 12, 2015. AR 319. After conducting a physical examination and administering various tests, Dr. Afra opined that Plaintiff could do light work with frequent fine and gross use of his hands. AR 324-25. The ALJ gave "great weight" to Dr. Afra's opinion as consistent with the objective findings in Plaintiff's treating records and his reported activities. AR 29.

Plaintiff alleges that this was legal error because (1) Dr. Afra only saw Plaintiff once and did not review his medical records; and (2) Dr. Afra failed to "include any discussion of a limitation to his shoulders" despite observing that Plaintiff reported pain and had "limited range of motion of the shoulders on examination." (JS at 20-21.)

While Dr. Afra did not review Plaintiff's medical records (AR 319), Dr. Afra examined Plaintiff in November 2015. Plaintiff fails to identify any records pre-dating November 2015 that would have informed Dr. Afra's evaluation beyond the medical history that Plaintiff provided. Notably, Dr. Afra did not record Plaintiff telling her that his back and shoulder pain started after a fall from a ladder or lifting something heavy, either in 2011 or 2015. AR 319-20.

Dr. Afra did not assess Plaintiff as having a limited range of shoulder motion. Instead, Dr. Afra observed, "Range of motion of both shoulders was slow and painful, but full range of motion was able to be achieved." AR 322. This observation was identical to that of the Olive View staff days earlier. AR 344 (noting full range of motion but "pain on overhead motion" with both shoulders); see also AR 520 (in May 2016, "patient reports improved symptoms after shoulder injections"), AR 499 (full range of motion for left shoulder in November 2016; "slight limitation" for right shoulder), and AR 487 ("using all extremities" in December 2016). While Dr. Afra did not expressly limit Plaintiff's use of his

shoulders to frequent, she did limit gross and fine use of his hands to frequent (AR 325), and it would be difficult to use one's shoulders more than one's hands in a work setting. Thus, Plaintiff has failed to identify any significant inconsistency within Dr. Afra's report, and the medical evidence (summarized above) supports the ALJ's finding that Dr. Afra's opinions were entitled to great weight for being consistent with Plaintiff's treating records.

### 4. Dr. Bessent.

In February 2018, medical consultant Dr. Bessent reviewed all of Plaintiff's records and offered opinions about Plaintiff's pre-LDI functional limitations. Dr. Bessent found Dr. Wang's MSS "not persuasive," because it post-dated Plaintiff's LDI and reflected a worsening of symptoms at that time. AR 626. Per Dr. Bessent, Plaintiff could frequently lift, push, or pull 10 pounds, engage in most postural activities "occasionally," and only do "occasional" reaching and "fine manipulation of hands." AR 628-30. Dr. Bessent did not identify any particular clinical findings from the treating records as supporting his opinions. Id.

The ALJ gave Dr. Bessent's opinions "partial" weight. AR 32. The ALJ found that his assessed limitations were inconsistent with Plaintiff's "conservative treatment without EMG testing" and "consultative examination findings of normal range of motion in upper extremities." AR 32. The ALJ assessed an RFC for "frequent reaching, fingering, [and] handling," rather than occasional. AR 25.

Plaintiff first argues that Dr. Bessent's opinions are not reliable. (JS at 22.) Plaintiff then argues that the ALJ "does not appear to reject his finding with regard to reaching," and therefore was required to incorporate it into the RFC. (Id.) In fact, the ALJ did explain why she rejected a limitation to "occasional" shoulder use and instead assessed "frequent" shoulder use: the findings of Dr. Afra, a doctor who actually examined Plaintiff and observed him use his shoulders. AR 32. As summarized above, Dr. Afra found that Plaintiff could achieve a full range of shoulder motion, albeit with pain, and she therefore limited him to "frequent" use

of his hands for gross manipulative movements.  AR 322, 325 (limiting Plaintiff's "gross movements" with his hands bilaterally to frequent).  The ALJ reasonably rejected Dr. Bessent's "occasional" shoulder use opinion in favor of Dr. Afra's "frequent" gross manipulative movement opinion.

## C. **ISSUE THREE-A: The ALJ's RFC Determination.**

Plaintiff argues that the ALJ failed to give legally sufficient reasons for rejecting Dr. Wang's MSS and Dr. Bessent's opinions, obligating the ALJ to adopt those opinions in the RFC analysis.  (JS at 28.)  For the reasons discussed above, the ALJ erred in assessing neither the MSS nor Dr. Bessent's opinions, so Plaintiff's arguments for Issue Three-A fail.

## D. **ISSUE THREE-B: Plaintiff's Past Relevant Work.**

### 1. **Summary of Relevant Administrative Proceedings.**

In a work history report, Plaintiff identified his past relevant work as an "auto parts distributor."  AR 191.  He did this job from 2000-2011.  Id.  His job duties were to "drive around and distribute various automotive mechanical parts including batteries, engine parts, alternators, axles, radiators, engine blocks, and more."  AR 192.  He indicated that he spent about 4 hours/day sitting, 3 hours/day walking, and 1 hour/day standing.  Id.  He denied being a "supervisor" or "lead worker," using machines, or writing reports; he left blank the question "Did you hire and fire employees?"  Id.

At the hearing, he explained that he and his brother owned a business selling auto parts, and his job duties included lifting and loading parts from a warehouse.  AR 51-52.  His brother ran the financial side of the business.  AR 57.  The business employed drivers and a receptionist.  AR 59.  Plaintiff had to "prepare the orders" by helping gather up purchased parts, load them into delivery vehicles, and instruct the drivers where to go.  AR 56.  This involved pulling parts for each order and placing them on the counter so that the drivers would not steal other parts.  AR 60.  His job duties also included interviewing and hiring drivers, scheduling their

routes, counting inventory, using a computer to keep track of sales, and handling customer complaints.  AR 61-62.

Based on his work history report, the VE initially characterized Plaintiff's past relevant work as that of a "parts clerk," DOT 322.367-042, a heavy, semi-skilled job.  AR 58.  After hearing Plaintiff's expanded testimony about his administrative job duties, however, the VE opined that some of Plaintiff's duties were consistent with those of a "warehouse manager."  AR 62.  The ALJ then asked Plaintiff, "How much time per week do you think that you spent doing the warehouse manager kind of duties and how much time do you think you spent doing the parts clerk duties?"  AR 63.  Plaintiff responded, "Parts clerk maybe 10%, the rest is all warehouse," confirming that 90% of the time, he performed "warehouse <u>manager</u> stuff."  <u>Id.</u> (emphasis added).

Based on this testimony, the VE then characterized Plaintiff past relevant work as "mainly the warehouse manager" job, DOT 184.167-114.  <u>Id.</u>  The VE and ALJ considered whether Plaintiff's past relevant work was a composite "medium" job and concluded that it was not, because medium work requires lifting 50 pounds or more 1/3 of the time, and Plaintiff estimated that the parts clerk portion of his job duties was only 1/10 of his time.[11]  AR 64.  After this discussion, the VE testified that the "most appropriate" classification for Plaintiff's past relevant work was that of warehouse manager.  <u>Id.</u>  The VE opined that a person with Plaintiff's RFC could work as a warehouse manager as that job is generally performed.  <u>Id.</u> 63-64.

The ALJ relied on this testimony to find that Plaintiff could do his past

---

[11] Earlier in the hearing, Plaintiff claimed that he spent more than 50% of the day lifting more than 50 pounds.  AR 59.  However, this directly conflicts both with his testimony later in the hearing and with his work history report.  <u>See</u> AR 192 (writing that he "frequently" lifted 25 pounds during the workday and spent 4 out of 8 hours sitting and 3 out of 8 hours walking).

relevant work as a warehouse manager.  AR 32.  According to the DOT, that job involves verifying incoming and outgoing shipments, establishing operational procedures, preparing orders, keeping inventory current, hiring warehouse personnel, and maintaining documentation.  DOT 184.167-114.  The job requires light exertion and "frequent" reaching, handling, and fingering.  Id.

### 2. Analysis of Claimed Error.

First, Plaintiff argues that the ALJ and VE erred by relying on his testimony that only 10% of his job involved parts clerk duties while 90% involved warehouse manager duties.  (JS at 29.)  According to Plaintiff, he did not understand what duties fell under each job title.  (Id.)

Plaintiff fails to demonstrate legal error.  In the context of the questioning and the ALJ's discussion with the VE, the ALJ's meaning was clear.  Id.  Neither Plaintiff nor his representative asked any questions or otherwise indicated confusion.  Indeed, Plaintiff stated that he was a "parts clerk maybe 10%," with the rest "all warehouse," the ALJ asked, "Okay, all warehouse the manager stuff?" AR 63 (emphasis added).  Plaintiff replied, "Yes."  Thus, Plaintiff confirmed that 90% of his duties were of the managerial type, as opposed to "lifting and carrying the parts."  Id.  Plaintiff's answer was consistent with the fact that he and his brother owned the business (AR 452); he told employees "where to go, what to do" (AR 56); he received a salary of $53,000 a year, as opposed to the $9-$10 an hour that the drivers received (AR 60); he hired and interviewed drivers (AR 61); he scheduled drivers for different routes, did inventory, and used a computer to keep track of sales (AR 62); he handled customer complaints whenever there was a problem (id.); and he spent half of his working hours sitting (AR 192).

Second, Plaintiff argues that the ALJ had a duty to further develop the record concerning the nature of Plaintiff's past relevant work.  (JS at 29.)  Again, Plaintiff fails to demonstrate legal error.  Plaintiff provided a work history report and several pages of hearing testimony about his past relevant work.  AR 192,

51-52, 56-63.  The VE and the ALJ were entitled to rely on Plaintiff's testimony. The fact that Plaintiff provided some inconsistent information does not demonstrate that the ALJ failed to discharge her duty to develop the record, or that the ALJ was not entitled to rely on Plaintiff's most recent testimony at the hearing elicited by the ALJ's questions.

Third, Plaintiff argues that substantial evidence does not support the ALJ's finding that his past relevant work was that of warehouse manager, rather than a composite job.  (JS at 30-31.)  Plaintiff cites Valencia v. Heckler, 751 F.2d 1082, 1086 (9th Cir. 1985) (holding that ALJ erred in classifying the claimant's prior work as a "tomato sorter" involving only light exertion because the claimant was actually an "agricultural laborer" who mostly performed other, medium exertion tasks).  (See JS at 31.)  This case is distinguishable from Valencia, under Stacy v. Colvin, 825 F.3d 563 (9th Cir. 2016), because the ALJ did not simply "isolate" the "least demanding function" of plaintiff's past relevant work and then find a light job that included that function.  "Rather, the ALJ confronted a situation where the plaintiff actually performed [his past relevant work] at a more demanding level than compared with industry standards."  Coehoorn v. Berryhill, No. ED CV 16-373-KS, 2017 WL 1407636, at *8 (C.D. Cal. Apr. 19, 2017); see also Stacy, 825 F.3d at 569 (noting that in Valencia, "the least demanding aspect" of the past job was something the claimant did less than half the time, and ALJ erred in equating that one task with a full time job).  Indeed, "Valencia and its progeny do not apply in cases such as this one where (1) the 'least demanding function' is a task that the claimant actually performed most of the time; and (2) the DOT defines the claimant's past job as requiring only that least demanding function." Stacy, 825 F.3d at 570.

///

///

///

24

**IV.**

**CONCLUSION**

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED:  March 26, 2020

_Karen E. Scott_

KAREN E. SCOTT
United States Magistrate Judge